# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

### CIVIL CASE NO. 1:09cv459

| | |
|---|---|
| **YEVETTE KILENE HUGHES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary

Judgment [Doc. 8] and the Defendant's Motion for Judgment on the

Pleadings [Doc. 21].

## I.    PROCEDURAL HISTORY

The Plaintiff Yevette Hughes protectively filed an application for a period

of disability and Social Security disability insurance benefits on September 21,

2004.  [Transcript ("T.") 80-82].  Plaintiff alleges that she became disabled as

of August 18, 2002 due to photophobia, double vision, vertigo, panic attacks,

high blood pressure, hypersensitivity to noise, hypoglycemia, anemia, and the

after-effects of a concussion.  [Doc. 10 at 6].  The Plaintiff's application was

denied initially and on reconsideration. [T. 55-58, 59-63]. A hearing was held before Administrative Law Judge ("ALJ") Ivar E. Avots on December 20, 2007. [T. 462-89]. On March 28, 2008, the ALJ issued a decision denying the Plaintiff benefits. [T. 10-21]. The Appeals Council accepted Plaintiff's proffer of additional evidence, but denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 5-9]. The Plaintiff has exhausted her available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than

creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.    THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's

physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled.  Id.  Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience.  Id.  Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past.  If the claimant can still perform that work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work.  If so, then the claimant is not disabled.  Id.


## IV.    FACTS AS STATED IN THE RECORD

Plaintiff was 42 years old at the time of the ALJ's hearing.  [T. 80, 464].  She completed the eleventh grade and obtained a GED.  [T. 464].  She testified that she has been unable to work since August 18, 2002, two weeks after a car accident where she sustained a head injury.  [T. 466].  She has made no further work attempts since that time.  [T. 466].

The relevant evidence of record regarding Plaintiff's physical impairments may be summarized as follows. Plaintiff was seen by Will L. Nash, M.D. of Sylva Family Practice on October 5, 2001. At that time, she reported having intermittent imbalance problems for which she was prescribed Antivert. She was also prescribed Xanax for anxiety. [T. 246]. Plaintiff returned to Dr. Nash on August 24, 2002, complaining of mild to moderate dizziness that began one week earlier and that was aggravated by movement. Plaintiff's examination was normal. Dr. Nash diagnosed her with labyrinthitis[1] and continued her prescription for Antivert. [T. 232]. Plaintiff returned on August 28, 2002, reporting that she was still dizzy but somewhat improved. She was diagnosed with improving labyrinthitis and placed on Phenergan. [T. 231].

On September 4, 2002, Plaintiff complained that her vertigo had not improved and that she was unable to drive. She also complained that the Phenergan "knocked her out." Dr. Nash prescribed a scopolamine patch. [T. 230]. On September 16, 2002, Plaintiff was seen by Raymond Gallinger, M.D. at Sylva Family Practice. She reported that her dizziness had about resolved

---

[1]Labyrinthitis is an inflammation of the part of the inner ear called the labyrinth; it may be accompanied by hearing loss or vertigo. Dorland's Illustrated Medical Dictionary, 1009 (31st Ed., Saunders Elsevier 2007).

but that she was experiencing blurred vision and abdominal pain. Dr. Gallinger referred to an ophthalmologist. [T. 229].

On September 18, 2002, Plaintiff was evaluated at Western North Carolina Eye Care. Her visual acuity was noted to be within normal limits. She was diagnosed with vertigo and referred to an ear, nose and throat specialist. [T. 165-66].

D.L. Wilkey, M.D. of Mountain Ear, Nose, & Throat Associates evaluated Plaintiff on October 11, 2002 for complaints of episodic vertigo. Plaintiff reported that the attacks began in August 2002. She further reported that she had been hospitalized as a child for a concussion and was currently being for treating for panic attacks. Dr. Wilkey's examination of Plaintiff's head, ears, eyes, nose, and throat were normal. An audiological examination was also normal. Dr. Wilkey diagnosed her with vertigo of unknown etiology and recommended an MRI. Dr. Wilkey recommended exercises for vertigo suppression and ordered vestibular rehabilitation (therapy for dizziness and imbalance). [T. 199-203].

When Plaintiff returned to see Dr. Nash on November 1, 2002, she reported continued vertigo and being unable to work because she could not drive. She reported missing two MRI appointments due to panic attacks. Dr. Nash prescribed Lexapro for her panic attacks. [T. 227].

A note from Dr. Wilkey dated November 15, 2002 indicated that Plaintiff was unable to tolerate the MRI due to claustrophobia. As a result, a CT scan was ordered. [T. 202]. The CT scan was performed on November 21, 2002 and was within normal limits. [T. 200]. On November 25, 2002, Plaintiff reported to Dr. Wilkey that her vestibular dysfunction was not improved with medication. Dr. Wilkey again diagnosed Plaintiff with vertigo of unknown etiology and recommended vestibular rehabilitation. [T. 199].

Plaintiff was evaluated for vertigo at Mountain Neurological Center on February 18, 2003 by Dr. Kenneth Shauger. At that time, Plaintiff reported that she had been in a car accident in August 2002 in which she had bumped her head. She reported that she began having persistent symptoms two weeks later of hypersensitive hearing, photophobia, and dizziness. She further reported problems with driving due to dizziness and motion sickness. Plaintiff also reported a history of head injury from the 1970's. Plaintiff's examination was completely normal and did not suggest any structural neurologic disease or vestibular abnormalities. Dr. Shauger noted that her balance was excellent. Dr. Shauger concluded that Plaintiff did not have true vertigo, but rather motion sickness. He indicated that mild head trauma could cause these types of symptoms while allowing a normal neurological exam. He further stated that it appeared that Plaintiff was improving spontaneously.

7

Dr. Shauger diagnosed Plaintiff with posttraumatic neurological symptoms including motion sickness, photophobia, and hypersensitive hearing. He did not recommend any further testing, appointments or medications. [T. 179-80].

On March 19, 2003, Plaintiff was seen by R. Scot Nixon, M.D. At that time, she reported that she still had some degree of unsteadiness and vertigo. She stated that she could drive her daughter to school if she drove at a relatively low speed on a flat road. She noted that she drove from supermarket to supermarket as part of her job and therefore had been unable to work, as driving exacerbated her vertigo. Dr. Nixon noted that Plaintiff also had a panic disorder, but that she had been unable to tolerate Lexapro because it made her feel weird and irritable. Dr. Nixon diagnosed Plaintiff with hypertension, well-controlled; a history of borderline thyroid functions; elevated cholesterol; Panic Disorder; and post-concussive syndrome. He noted that he would keep Plaintiff on Xanax for her Panic Disorder. [T. 185].

Plaintiff returned to see Dr. Gallinger on May 1, 2003. At that time, she complained of sinus and chest congestion. She also reported that her panic attacks had worsened. She noted that she was no longer working because she could not drive due to vertigo. She also reported smoking more. Dr. Gallinger diagnosed Plaintiff with hypertension and acute bronchitis. He continued Plaintiff's prescription for Xanax. [T. 221]. On August 26, 2003,

Plaintiff reported continued vertigo and that she was unable to drive. [T. 218]. During a visit with Dr. Nash on October 21, 2003, moderately severe labryinthitis was noted. [T. 213]. In a visit with Dr. Gallinger on November 11, 2003, Plaintiff reported that she still drove her daughter the one mile to school. At that time, Dr. Gallinger noted that Plaintiff was in no distress. [T. 211].

On December 12, 2003, Plaintiff indicated that her vertigo was improving, although she still had some positional dizziness and nausea. She also reported being able to drive longer distances. [T. 208]. On a form prepared for Plaintiff's insurance company, Dr. Gallinger indicated that he had reproduced Plaintiff's vertigo during that day's office visit by having her sit up quickly and turn her head. [T. 320].[2]

Plaintiff reported being able to drive "longer distances" on December 12, 2003, May 6, 2004 and November 5, 2004. [T. 208, 318, 404]. It was further noted that the severity of her labyrinthitis was improved. [T. 318, 404].

On March 18, 2004, Robert Gardner, MD performed a Residual Functional Capacity (RFC) assessment of the Plaintiff for Disability Determination Services (DDS). [T. 279-286]. Dr. Gardner assessed her as

---

[2] The copy of Dr. Gallinger's note on this form that is reproduced in the record is partially cut off and thus is not entirely legible. It appears that Dr. Gallinger wrote: "[h]er symptoms are no___ [remainder of this word cut off] as severe as when I first evaluated her." [T. 320]. The cut off word would seem to be "not," given that his actual office note of that same date [T. 208] indicates that the severity of her labyrinthitis was improving.

being stable on her medications. He limited her to medium exertion with limited exposure to heights, hazards, excessive noise and climbing. [T. 286].

Plaintiff visited Thoms Rehabilitation Hospital on May 26, 2004 regarding her vertigo. She reported that the vertigo was due to traveling over varying altitudes. Mild nystagmus was observed during the Dix-Hallpike test. It was noted that she had difficulty maintaining balance under changing somatosensory input conditions, especially with reliance on her vestibular system. She was referred to her local hospital for vestibular therapy. [T. 305-09].

Beginning in July 2004, Plaintiff underwent physical therapy at Westcare Health System. [T. 325-337]. At her initial appointment, she indicated she could not ride in a car or on an escalator and that she could not wash dishes. [T. 336]. On August 16, 2004, she reported that her dizziness was somewhat reduced. By September 24, 2004, she reported experiencing diminished dizziness and nausea while riding in a car. It was noted that she could walk and turn using different head positions without nausea, and that she had minimal disruptions in visual tracking. By the time of her October 13, 2004 discharge, Plaintiff had met almost all of her treatment goals with the exception of being able to ride an escalator without dizziness. [T. 332].

On July 7, 2004, an eye exam by Mountain Eye Associates revealed

diplopia (double vision), convergence insufficiency, diabetes, and astigmatism. It was noted that diplopia was not a specific disorder, but a symptom indicating many possible causes. Convergence exercises were recommended to overcome the convergence insufficiency. [T. 310-13].

On July 14, 2004, Dr. Gallinger performed an Estimation of Physical Capacities for the Plaintiff. In this form, Dr. Gallinger noted that Plaintiff was still undergoing vestibular rehabilitation and was not yet at maximum medical improvement. He indicated Plaintiff had no limitations on sitting, standing, or walking. He further indicated that she should never drive, be near moving mechanical parts, climb, crouch, reach above her shoulders, or be exposed to moving mechanical parts, marked changes in temperature or humidity, or dust, fumes and gases. He stated that she should only occasionally stoop, kneel, and balance. [T. 314-15].

On December 21, 2004, Charles Burkhart, M.D. performed another physical Residual Function Capacity (RFC) assessment of Plaintiff. Dr. Burkhart also found Plaintiff capable of medium work, although with greater limitations than Dr. Gallinger had stated in his assessment. [T. 338-45].

Dr. Nash submitted a statement regarding Plaintiff on March 11, 2005, opining that Plaintiff was "totally disabled" due to vertigo. He opined that this condition prevented Plaintiff from driving and was aggravated by minimal

positional changes. He also noted that Plaintiff's double vision precluded her from reading, typing, and performing other sedentary type jobs. Dr. Nash noted that Plaintiff's condition could not be corrected in a certain amount of time, and he was unable to say when she would be able to perform light duty work. He opined that Plaintiff was currently unable to lift more than three pounds and could not stoop or bend without losing focus. He further stated that she was unable to make sudden moves or move her head from side to side in sudden movements. [T. 415].

On March 29, 2005, Plaintiff returned to Mountain Ear, Nose & Throat for objective testing to confirm her impairments. An ENG (Electronystagmography) confirmed her labyrinthine disorder. Plaintiff's refusal to abstain from taking Xanax for 48 hours, as required to optimize VNG (Videonystagmography) testing, interfered with the smooth pursuit subtest, which was the only test result which fell outside normal limits. Plaintiff declined the Dix-Hallpike test, claiming neck pain. [T. 362-71].

On May 16, 2005, Dorothy Linster, MD reviewed additional evidence for Disability Determination Services (DDS) and affirmed the December 21, 2004 physical RFC assessment. [T. 373].

In a visit on August 17, 2006, Dr. Nash rated her symptoms as "improving." [T. 427]. On August 29, 2006, he noted that Plaintiff's vertigo

was only "occasional." [T. 432]. On November 10, 2006, Dr. Nash noted that Plaintiff's labyrinthitis and blurred vision were "resolved." [T. 435-36].

On December 4, 2007, Dr. Nash filled out a Physical Residual Functional Capacity Questionnaire. In it, he noted that neither emotional nor psychological factors contributed to the severity of Plaintiff's limitations. He indicated that pain frequently interfered with her attention and concentration, that she was severely limited in her ability to deal with work stress, that she could walk one to two city blocks without rest, that she could sit two hours and that she could stand one hour either continuously or in total during a day. He found Plaintiff to be significantly limited in repetitive manipulations. Dr. Nash noted that her ability to walk was limited by dizziness. Dr. Nash did not indicate that any assistive devices were needed, however, and no lifting limits were stated. Dr. Nash opined that Plaintiff's impairments would cause her to be absent from work more than three times per month. [T. 381-85].

The evidence of record regarding Plaintiff's mental limitations is as follows. On January 18, 2004, Robert Johnson, Ph.D. performed a Mental RFC assessment for DDS. Dr. Johnson opined that Plaintiff was capable of understanding and remembering very short and simple instructions and of maintaining concentration and attention to complete simple tasks. He further opined that Plaintiff was capable of relating appropriately to others, and that

she could adapt to stress and changes in an environment that is not highly production-oriented.  [T. 191-94].

Jerry Coffey, Ph.D. conducted a mental health evaluation for DDS on March 4, 2004.  Dr. Coffey assessed Plaintiff with panic attacks without agoraphobia and generalized anxiety disorder, which he noted was somewhat improved with medication.  He further found that she could perform simple, routine, repetitive tasks; interact with peers and coworkers; respond appropriately to supervisors; and maintain pace, concentration, and persistence.  [T. 195-98].

Clifford Charles, Ph.D. completed a Psychiatric Review Technique and a Mental RFC assessment on April 12, 2004.  Dr. Charles concluded that Plaintiff could understand and remember simple instructions and maintain concentration to complete a variety of simple tasks with some detail at a non-rapid pace, although he noted that an exacerbation of her anxiety symptoms or a panic attack may affect her performance.  He further found that Plaintiff could relate appropriately to co-workers and supervisors, although he noted that her anxiety and panic attacks might limit her effectiveness with the general public.  Dr. Charles also found that Plaintiff could adapt to routine demands of work associated with simple tasks and encountering  some details at a non-rapid pace and with limited contact with the public.  [T. 287-

304].

Dr. Johnson conducted a Psychiatric Review Technique on January 18, 2005. He assessed Plaintiff with panic disorder. He found that Plaintiff had moderate limitations in concentration, persistence or pace. [T. 348-61].

Plaintiff underwent a mental health evaluation by Michael Penland, Ph.D. for DDS on August 18, 2005. Dr. Penland assessed Plaintiff with generalized anxiety disorder, panic disorder without agoraphobia, rule out bipolar disorder, and a Global Assessment of Functioning Score (GAF) of 75. He found that she could understand, retain and follow instructions, sustain attention to simple repetitive tasks, and relate to others. Dr. Penland opined that "because of her physical problems, [she could not] reliably or consistently tolerate the stress and pressures associated with day to day work activities." [T. 374-77].

On October 24, 2007, Karen Marcus, Psy.D. performed a psychological evaluation of the Plaintiff. After performing a battery of testing procedures, Dr. Marcus diagnosed Plaintiff with "bipolar disorder, NOS; rule out schizoaffective disorder, panic disorder without agoraphobia; undifferentiated somatization disorder; post-traumatic stress disorder; learning disorder NOS; cognitive disorder NOS (provisional), and a GAF score of 45." [T. 386-401].

Dr. Marcus also performed a Mental Residual Functional Capacity

Questionnaire. On this form, Dr. Marcus indicated that Plaintiff was "unable to meet competitive standards" in the following areas: carry out very short and simple instructions, maintain attention for two hour segment, complete a normal workday and week without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, deal with normal work stress, carry out detailed instructions, and deal with stress of semiskilled and skilled work. She further found Plaintiff to be "serious limited, but not precluded" in seven additional areas. Dr. Marcus noted that it was "not clear" whether Plaintiff had a "low IQ or reduced intellectual functioning." She opined that Plaintiff's impairments would make her miss about four days of work per month. [T. 397-401].

At the ALJ hearing, Plaintiff testified that her worst problem is her vision, specifically her ability to focus. She testified that dizziness, hypersensitive hearing, and sensitivity to light also impair her. [T. 470]. She testified that she wears sunglasses even indoors if she is watching television or is exposed to bright interior lights. [T. 473-4].

Plaintiff stated that she has trouble concentrating, especially during panic attacks. She reported having five or six panic attacks and bouts of dizziness per day. Plaintiff indicated that she has to walk slowly and hold on to things or other person to assist her in balancing. [T. 482]. She stated that

she cannot read or watch movies. [T. 475]. She further testified that she does not cook because standing at the stove makes her too dizzy. Plaintiff testified that she cannot take her daughter to school. She reported that she sleeps only three hours most nights and as a result, lies down for two to three hours every morning. [T. 476, 479]. With respect to activities of daily living, Plaintiff testified that she is able to wash and fold clothes, although she cannot bend to put the clothes away in drawers. She could not ride in the front seat of a car due to fear. [T. 480]. She testified that she has no hobbies, has no pets, and visits only with her elderly neighbor. [T. 482].

As part of the proceeding the ALJ asked the vocational expert (VE) if jobs existed in significant numbers in the national or regional economy that would accommodate an individual of Plaintiff's age, education, work history, and functional limitations. [T. 485]. The vocational expert responded that the jobs of cafeteria attendant, cashier, and office clerk would be available to such an individual. [T. 486]. The expert further testified that his answer was consistent with information contained in the Dictionary of Occupational Titles ("DOT"). [T. 487].

## V.   THE ALJ'S DECISION

On March 28, 2008, the ALJ issued a decision denying the Plaintiff's claim. [T. 14-36].  Proceeding to the sequential evaluation, the ALJ found that the Plaintiff had a date last insured of December 31, 2007, and that she had not engaged in any substantial gainful activity since August 18, 2002, her alleged onset date.  [T. 16].  The ALJ then determined the following was a severe combination of impairments: vertigo/labyrinthitis,[3] convergence insufficiency with diplopia; diabetes mellitus type II; panic disorder without agoraphobia; and generalized anxiety disorder.  [T. 16].  The ALJ concluded that her impairments did not meet or equal a listing.  [T. 16].  He then determined that Plaintiff retained the residual functional capacity (RFC) to perform light unskilled work with limitations to routine and repetitive tasks only; no climbing or crouching; occasional kneeling, balancing, crawling, reaching forward and stooping; and no exposure to moving mechanical parts, or marked changes in temperature and humidity, and no driving automotive equipment. [T. 18].  He found that Plaintiff could not perform her past relevant work.  [T. 34].  He found that Plaintiff was a younger individual with at least a high school education, and transferability of skills was not material.  [T. 34].

---

[3] For reasons that are not explained, the ALJ in his decision consistently spelled labyrinthitis as "labryinthitis."

The ALJ then determined that jobs did exist in significant numbers which Plaintiff could perform. [T. 35]. Accordingly, he concluded that the Plaintiff was not disabled from the alleged onset date of August 18, 2002, through her date last insured, December 31, 2007. [T. 35].

## VI.    DISCUSSION

Plaintiff argues that the ALJ 1) attributed insufficient weight to her treating physician's opinion, 2) inaccurately evaluated her RFC, 3) improperly evaluated the vocational expert's testimony, and 4) improperly evaluated her pain and other symptoms.

**A.    The ALJ properly evaluated treating physician evidence, and his findings are supported by substantial evidence.**

Plaintiff asserts that the ALJ erred in assessing the opinions of her treating physicians, Dr. Will Nash and Dr. Roy Gallinger. Specifically, she argues that the ALJ erred in concluding that Dr. Nash's opinion was not supported by the evidence of record, including his own treatment notes and those of Dr. Gallinger. She further asserts that the ALJ afforded significant weight to parts of Dr. Gallinger's opinion while erroneously ignoring others.

When evaluating the medical opinion of a treating physician, the ALJ must determine whether that opinion should be given controlling weight. 20 C.F.R. § 404.1527(d). In order to be granted controlling weight, the opinion

must be from a treating source; it must be a medical opinion concerning the nature and severity of the claimant's impairment; and it must be well-supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R.§ 404.1527(d); Social Security Ruling ("SSR") 96-2p. If an opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining the weight to be afforded to the opinion: 1) the examining relationship; 2) the length, nature, and extent of the treatment relationship; 3) the extent to which the evidence supports the opinion; 4) the opinion's consistency with the record as a whole; 5) the specialty of the medical source; and, 6) other relevant factors. 20 C.F.R. § 404.1527(d)(1)-(6).

In the present case, there is substantial evidence to support the ALJ's finding that Dr. Nash's opinions were not supported by the evidence of record. For example, although Dr. Nash stated that Plaintiff was unable to work due to vertigo and double vision, Dr. Nash's treatment notes reveal that Plaintiff's labyrinthitis and blurred vision had resolved as of November 10, 2006. [T. 33, 436]. Plaintiff did not report any difficulties with these conditions again until December 4, 2007, more than one year later, when Plaintiff asked Dr. Nash to fill out disability forms. [T. 33, 452]. Similarly, although Dr. Nash opined in December 2007 that Plaintiff's vertigo would limit her abilities to stand and walk, treatment notes of both Drs. Nash and Gallinger document that from

September 2002 through at least November 2007, Plaintiff demonstrated normal gait and normal balance. [T. 205, 208, 211, 214, 217-18, 221, 226-27, 229-31, 316, 427, 433, 436, 450]. Additionally, physical therapy records from July through October 2004 show that Plaintiff experienced some decrease in dizziness with exercises; that she was able to perform visual tracking without disruption; that she was able to turn her head and maintain focus; and that the nausea she experienced with turning, walking, and head movements was minimal to none. [T. 329, 332]. The ALJ further observed that videonystagmography ("VNG") testing revealed no spontaneous nystagmus and no positional nystagmus in five positions tested. [T. 33, 364]. This evidence undermines Dr. Nash's conclusion that Plaintiff's labyrinthitis prevented her from working, standing, and walking.

With respect to Dr. Gallinger, the ALJ afforded his opinion significant weight because he believed that it was "a fairly accurate representation of [Plaintiff's] [residual functional capacity] at the time." [T. 33]. The ALJ's RFC finding corresponds with Dr. Gallinger's assessment of Plaintiff's abilities to sit, stand, lift, carry, climb, crouch, stoop, kneel, balance, crawl, and reach forward, as well as with Dr. Gallinger's assessment of Plaintiff's environmental limitations. [T. 18, 314-15]. While Dr. Gallinger also opined that Plaintiff could never reach above her shoulders and that she had no restrictions in walking

if she could hold on to something, the medical evidence of record does not support Dr. Gallinger's limitations in these areas. Treatment notes from Dr. Nash and Dr. Gallinger routinely reflect that Plaintiff had no problems with gait or balance, and neither physician noted that Plaintiff required an assistive device to ambulate. [T. 205, 208, 211, 214, 217-18, 221, 226-27, 229-31, 316, 427, 433, 436, 450]. Additionally, as discussed above, physical therapy records show that while Plaintiff initially demonstrated difficulties with gait when she would turn her head or stop or turn, by the time of her discharge from physical therapy, she was able to walk and turn with different head positions without loss of balance or nausea. [T. 326]. This evidence belies Dr. Gallinger's statement that Plaintiff needed support when walking.

With regard to Dr. Gallinger's statement that Plaintiff could not perform any reaching over the shoulders, nothing in the record supports this particular restriction. None of Plaintiff's impairments implicate a restriction in reaching, and there is no evidence that Plaintiff ever complained of or demonstrated difficulty with reaching above her shoulders. As such, the ALJ correctly declined to include these limitations in his assessment of Plaintiff's RFC.

Plaintiff also claims that the ALJ ignored Dr. Gallinger's May 2005 opinion that she was unable to work because of her vertigo and convergence insufficiency. A review of the record, however, reveals that Dr. Gallinger did

not affirmatively render such an opinion. Rather, Dr. Gallinger merely memorialized Plaintiff's stated complaint at that visit that she was "unable to work because of her vertigo and visual problems." [T. 417]. Even if the treatment note could be interpreted as Plaintiff suggests, an opinion that Plaintiff was disabled due to vertigo and convergence insufficiency is contravened by Dr. Gallinger's prior opinion as well as by the evidence of record.

In sum, the Court agrees with the ALJ's assessment that Dr. Nash's opinion that Plaintiff was unable to work, stand, or walk is directly contradicted by the medical evidence, while Dr. Gallinger's walking and reaching restrictions are not supported by any of the evidence of record. The Court therefore concludes that the ALJ's assessment of these treating physicians' opinions followed applicable law, and his findings in that regard are supported by substantial evidence. For these reasons, this assignment of error is overruled.

**B.     The ALJ's assessment of Plaintiff's RFC followed applicable law and is supported by substantial evidence.**

### 1.     Limitations from Mental Impairments

The ALJ determined that Plaintiff's mental impairments restricted her to performing unskilled work. Plaintiff alleges, however, that the ALJ did not impose any mental restrictions on her ability to perform work-related activities,

despite finding that Plaintiff's panic disorder without agoraphobia and generalized anxiety disorder were severe impairments. Plaintiff argues that the ALJ's restriction to unskilled work is not a true limitation because it does not represent a limitation on Plaintiff's ability to perform basic work activities, and she contends that the ALJ should have adopted the limitations assessed by the non-examining medical consultants.

Contrary to Plaintiff's argument, a restriction to unskilled work does constitute a limitation on an individual's functional capacity. Given the different tasks and responsibilities required by unskilled, semi-skilled, and skilled work, see 20 C.F.R. § 404.1568, the ALJ's restriction of Plaintiff to unskilled work represents a limitation on Plaintiff's abilities to exercise judgment and perform more complex work duties. Even if Plaintiff were correct in her assertion that unskilled work represents only an ability to perform basic work activities and, thus, is not a limitation reflective of a severe impairment, there is no error in the ALJ's RFC assessment. The determination of a "severe" impairment at step two of the sequential evaluation process is a *de minimis* test, designed to weed out unmeritorious claims. See Bowen v. Yuckert, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A finding of *de minimis* limitations is not proof that the same limitations have the greater significant and specific nature required to gain

their inclusion in an RFC assessment at step four. See, e.g., Sykes v. Apfel, 228 F.3d 259, 268 n.12 (3d Cir. 2000). Therefore, the ALJ's finding that her panic disorder without agoraphobia and generalized anxiety disorder were severe impairments at step two did not necessarily require the ALJ to include the limitations from such impairments in his analysis at step four.

Plaintiff next argues that the ALJ should have adopted the opinions of the nonexamining state agency medical consultants, one of whom concluded that Plaintiff should not serve in a work environment that is highly production-oriented, and the other who opined that Plaintiff required a "non-rapid pace" with limited contact with the public. [T. 194, 289]. As the ALJ noted, however, these opinions were rendered in 2004; subsequent medical evidence shows that Plaintiff's condition stabilized. [T. 34]. Furthermore, as noted by the ALJ, Plaintiff never sought treatment from a mental health professional, and she consistently denied symptoms of depression and anxiety to her treating physicians. [T. 318, 404, 411, 421, 426, 432, 435, 449, 452]. Indeed, neither Dr. Nash or Dr. Gallinger listed depression or anxiety as a diagnosis, nor do their notes reflect that Plaintiff ever complained of any symptoms of depression or anxiety. [T. 319, 405, 412, 418, 422, 427, 433, 436, 442, 448, 450, 453]. In his March 2005 opinion letter, Dr. Nash attributed Plaintiff's disability to her physical impairments only

and did not opine that Plaintiff was limited by any mental impairment. [T. 415]. In his December 2007 assessment, when asked to identify any psychological conditions that affected Plaintiff's physical conditions, Dr. Nash identified none. [T. 382]. Similarly, Dr. Gallinger failed to identify any mental impairments or resulting limitations when he assessed Plaintiff's RFC. [T. 314-15]. Because the record evidence does not support the limitations identified by the non-examining medical consultants, the ALJ properly declined to incorporate these limitations in his RFC assessment.

### 2. Limitations from Physical Impairments

Plaintiff next argues that the ALJ erred in assessing her RFC because he failed to include any limitations resulting from her double vision and vertigo.

Plaintiff's argument must be rejected for several reasons. With regard to Plaintiff's double vision, the evidence does not support a finding that this condition imposed any functional limitations beyond those included in the ALJ's RFC finding. While it was noted in May 2005 that Plaintiff's double vision, if not corrected, would cause Plaintiff to see clearly at close distances only through one eye at a time, subsequent medical records show that this condition improved. [T. 416]. Plaintiff consistently denied any visual problems to Drs. Nash and Gallinger. [T. 426, 432, 435]. In January and August 2006, Plaintiff's blurred vision was described as stable, and in November 2006, Dr.

Nash noted that Plaintiff's blurred vision had resolved. [T. 422, 433, 436]. Indeed, following her 2005 evaluation, the record indicates that Plaintiff complained only once of blurred vision, and that complaint arose in December 2007 when she asked Dr. Nash to complete disability forms on her behalf. [T. 452]. Even then, Dr. Nash did not diagnose Plaintiff with any visual impairment. [T. 453]. The record does not support Plaintiff's assertion that her double vision imposed functional restrictions that should have been included in the RFC assessment.

Plaintiff's argument that the ALJ did not include any limitations stemming from her labyrinthitis is without merit. The ALJ specifically restricted Plaintiff from work that required any climbing or crouching and any more than occasional stooping, kneeling, balancing, and crawling. [T. 18]. He further found that Plaintiff should avoid all exposure to moving mechanical parts, and that she would be unable to drive automotive equipment. [Id.]. These restrictions reflect the ALJ's consideration of the effects of Plaintiff's labyrinthitis. Plaintiff's argument to the contrary is simply without merit. For these reasons this assignment of error is overruled.

**C.    The ALJ properly evaluated Vocational Expert testimony, and his finding that other work exists that Plaintiff can do is supported by substantial evidence.**

Plaintiff next argues that the ALJ erred at step five by ignoring the conflicts between VE testimony and the DOT.

Social Security Ruling 00-4p, on which Plaintiff relies, governs how an ALJ may use vocational expert testimony:

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p at *4. "[W]e rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy." Id. at *2.

Plaintiff asserts that the ALJ erred in relying on jobs identified by the VE which are shown by the DOT to require frequent reaching [Doc. 10 at 24, Exh. A, B and C], a finding which she argues conflicts with the ALJ's RFC assessment limiting her to occasional reaching forward.  [T. 18].  Nothing in the DOT, however, states that the three jobs identified by the VE require frequent reaching in *all* directions.  Rather, the DOT broadly indicates that all

three jobs require frequent reaching, without specifying direction.  Given the DOT's silence, the ALJ properly obtained testimony of the VE on this issue.  The ALJ posed a hypothetical question to the VE that encompassed all of the limitations included in the ALJ's RFC, including her limited ability to reach forward.  [T. 485].  Even taking these limitations into account, the VE responded that Plaintiff still could perform the jobs of cafeteria attendant, cashier, and office clerk.  [T. 486].  As the VE possesses specialized knowledge of current vocational practices, he was qualified to determine which jobs Plaintiff could perform, and the ALJ properly relied on his testimony in finding that Plaintiff could perform other work that existed in significant numbers in the national economy.  See Moffett v. Apfel, No. Civ. A. 99-0915-P-S, 2000 WL 1367991, at *7-8 (S.D. Ala. Sep. 1, 2000).  Thus, the VE's testimony that an individual with Plaintiff's limitations could perform these three jobs constitutes substantial evidence for the ALJ's decision.  For these reasons this assignment of error is overruled.

**D**.     **The ALJ's analysis of Plaintiff's pain and symptoms followed applicable law and was supported by substantial evidence.**

In her next assignment of error, Plaintiff argues that the ALJ improperly evaluated her complaints of symptoms from vertigo, anxiety, and labyrinthitis.  She specifically takes issue with three statements made by the ALJ in his discussion of why he found the Plaintiff's complaints were not fully credible.

[Doc. 10 at 25-6].

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir.1996), citing 20 C.F.R. § 416.929(b); § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects his ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1) and § 404.1529(c)(1).

Having found as severe conditions that could be expected to cause pain, the ALJ's decision quite thoroughly recounted her medical and testimonial evidence relating to symptoms, their duration, frequency and intensity, and the efficacy of treatment. [T. 19-32]. He pointed out numerous inconsistencies between the reported severity of her double vision and labyrinthitis and objective medical findings. [T. 32]. Within that discussion, he noted Plaintiff's delay in seeking medical treatment after the car accident that she fairly consistently reported as the origin of those problems. Plaintiff argues that this delay is irrelevant because she was eventually diagnosed with

labyrinthitis and double vision.  Contrary to Plaintiff's argument, however, her failure to seek treatment at the time of the precipitating event is relevant to the assessment of her credibility.  While Plaintiff alleges that the conditions she suffered as a result of this accident are disabling, she fails to explain why she did not seek treatment at the time the accident occurred.  This unexplained inconsistency is highly probative of Plaintiff's credibility.  See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994).  The ALJ's consideration of Plaintiff's delay in treatment, therefore, was not error.

Plaintiff also takes issue with the ALJ's finding that her vertigo had resolved by November 2006 and that she did not report the problem again until December 2007, when she sought a disability opinion from Dr. Nash. Specifically, Plaintiff asserts that Dr. Nash's May 2007 treatment note shows that her vertigo continued intermittently.  This treatment note, however, merely establishes that Plaintiff *reported* intermittent symptoms associated with labyrinthitis; Dr. Nash himself made no such finding and failed to include labyrinthitis in his list of diagnoses.  [T. 441].  The ALJ's finding in this regard was not error.

Plaintiff further argues that the ALJ erred in discounting her complaints of panic attacks because she never sought mental health treatment.  The ALJ did not err in this regard.  While Dr. Nash prescribed Xanax to Plaintiff, he had

not identified anxiety as a diagnosis in recent years, and his treatment notes indicate that Plaintiff consistently denied the presence of anxiety. [T. 33, 204-05, 213-14, 404-05, 411-12, 418, 421-22, 426-27, 432-33, 435-36, 449-50, 452-53].[4]

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). Plaintiff points to no evidence that reconciles the inconsistencies found by the ALJ, and the record amply supports his findings of fact. Given the deference due to the ALJ's credibility determination, the Court finds that the ALJ's analysis of pain and symptoms at step four followed applicable law and is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability through the date of his decision.

---

[4]Plaintiff's argument that her history of taking Xanax proves the existence of severe mental health limitations rehashes her theory that a finding of limitations at step two of the sequential evaluation process dictates the findings of limitations at step four. This argument is addressed in Part B.1. supra, and for the reasons previously stated, that argument states no error.

**O R D E R**

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's

Motion for Summary Judgment [Doc. 21] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Judgment on

the Pleadings [Doc. 8] is **DENIED**.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: September 26, 2011

Martin Reidinger
United States District Judge